# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>*(Briefly describe the property to be searched or identify the<br>person by name and address)*<br><br>A two-tone gray and blue Recreational Vehicle with<br>a red "B" spray painted on the panel behind the<br>driver's door and a yellow panel affixed to the rear<br>driver's side that is usually parked within a 0.2 mile<br>radius of 6236 S. St. Andrews Place, Los Angeles,<br>California. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. **2:23-MJ-01809** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with intent to distribute controlled substances |
| 21 U.S.C. § 846 | Conspiracy and attempt to distribute controlled substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ *DEA Special Agent Thomas Coughlin*

*Applicant's signature*

DEA Special Agent Thomas Coughlin

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

City and state: <u>Los Angeles, CA</u>

*Judge's signature*

Honorable Maria A. Audero, U.S. Magistrate Judge

*Printed name and title*

AUSA: Elizabeth Douglas, x5728

**<u>ATTACHMENT A</u>**

<u>VEHICLE TO BE SEARCHED</u>

     A two-tone gray and blue Recreational Vehicle ("RV") that is usually parked within a 0.2 mile radius of 6236 S. St. Andrews Place, Los Angeles, California ("SUBJECT VEHICLE"). There are no apparent identifying numbers, such as a license plate, affixed to the exterior of the SUBJECT VEHICLE.  The SUBJECT VEHICLE appears to have four wheels, has light blue rims, a yellow panel affixed to the rear driver's side, and a blue tarp attached to the roof.  There is a red "B" spray-painted on the panel behind the driver's door.  The SUBJECT VEHICLE is depicted below:



**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

d.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

i

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

      e.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      f.  Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      g.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

      h.  Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook,

Facebook Messenger, Snapchat, FaceTime, Skype, Signal, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

i.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

j.   Contents of any calendar or date book;

k.   GPS coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved userna.m.es and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security

software designed to detect malicious software;

   iii. evidence of the attachment of other devices;

   iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

   v.   evidence of the times the device was used;

   vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

   vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

   viii.    records of or information about Internet Protocol addresses used by the device;

   ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

  3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing

data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic

image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable,

return the device and delete or destroy all forensic copies
thereof.

       e.   If the search determines that a digital device
does contain data falling within the scope of items to be
seized, the government may make and retain copies of such data,
and may access such data at any time.

       f.   If the search determines that a digital device is
(1) itself an item to be seized and/or (2) contains data falling
within the scope of other items to be seized, the government may
retain the digital device and any forensic copies of the digital
device, but may not access data falling outside the scope of the
other items to be seized (after the time for searching the
device has expired) absent further court order.

       g.   The government may also retain a digital device
if the government, prior to the end of the search period,
obtains an order from the Court authorizing retention of the
device (or while an application for such an order is pending),
including in circumstances where the government has not been
able to fully search a device because the device or files
contained therein is/are encrypted.

       h.   After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

    5.   The review of the electronic data obtained pursuant to
this warrant may be conducted by any government personnel
assisting in the investigation, who may include, in addition to

law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.     During the execution of this search warrant, law enforcement is permitted to: (1) depress MANZANAREZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MANZANAREZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Thomas Coughlin, being duly sworn, declare and state as follows:

### **I.  PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a search warrant for the Recreational Vehicle ("RV") parked in the vicinity of St. Andrews Place and Gage Ave., Los Angeles, California (the "SUBJECT VEHICLE"), as described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are on or about those indicated.

## II. __BACKGROUND OF AFFIANT__

3.    I am a United States Drug Enforcement Administration ("DEA") Special Agent and have been since March 2020.  I am currently assigned to the Los Angeles Field Division, Enforcement Group 2.  In the course of my employment with the DEA, I have received approximately 16 weeks of specialized training at the DEA Academy in Quantico, Virginia involving the use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, money laundering techniques, and conspiracy investigations.  I have also participated in drug investigations.  I have utilized a variety of investigative techniques and resources in furtherance of drug investigations, including, but not limited to, surveillance, use of confidential sources, undercover operations, telephone toll analysis, installation, monitoring and retrieval of trackers, and wire intercept communications analysis in Title III and wiretap investigations.

4.    Through my training and experience, as well as through consultation with other experienced investigators in the DEA and other agencies, I have become familiar with the methods of drug traffickers, and their use of telephones and other devices to conduct their criminal enterprises.  I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of narcotics and the collection of monetary proceeds of drug trafficking.  I am familiar with the unlawful importation, possession with the intent to distribute, and distribution of controlled substances, as well as the

related monetary transactions involving the proceeds of
specified unlawful activities, and conspiracies associated with
criminal drugs.  I am also familiar with their techniques to
conceal assets and proceeds from their illegal activities and
the types and amounts of profits made by drug trafficking.

5.    Before I became a DEA Special Agent, I was a Community
Service Officer and Detention Aid for approximately three years
in Oak Lawn, Illinois.  I was also a peace officer in the State
of Illinois for approximately six years.  While serving as a
peace officer in Illinois, I was a patrolman in the City of
Burbank, Illinois.  During that time, I was involved in drug
investigations, and I was also a part of burglary task force
teams.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.    DEA Los Angeles Field Division Group 2 Special Agents
("DEA agents") and the Los Angeles Police Department ("LAPD")
77th Division Narcotics and Gang Units are currently conducting
a joint drug investigation into a region of South Los Angeles
known for high drug trafficking activity.

7.    Specifically, during LAPD physical patrol and
surveillance of this area in December 2022, LAPD officers have
observed foot traffic to and from the SUBJECT VEHICLE that is
consistent with multiple hand-to-hand drug transactions.

8.    Between January 25, 2023 and April 6, 2023, at the
direction of the DEA, a confidential source ("the CS")
approached the SUBJECT VEHICLE, which has been seen parked in
the vicinity of St. Andrews and Gage Ave, Los Angeles,

California, and purchased drugs on multiple occasions from the same individual -- Brenda MANZANAREZ -- and later one unidentified male subject, who retrieved the drugs from inside the SUBJECT VEHICLE during all but one of these transactions.

## IV. STATEMENT OF PROBABLE CAUSE

9.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

a.   In December 2022, LAPD 77th Division Narcotics and Gang Units identified the SUBJECT VEHICLE as a location associated with heavy foot traffic and interactions of individuals that exhibit characteristics of and are consistent with street level drug transactions based on LAPD officers' surveillance of the area.

b.   LAPD officers have also identified Brenda MANZANAREZ, also known as "Bitcha," as an occupant of the SUBJECT VEHICLE who sells methamphetamine from the SUBJECT VEHICLE.  LAPD officers in the 77th Division have previously arrested MANZANAREZ in 2016 and 2020 for possession of a controlled substance.

c.   Prior to December 2022, DEA began working with the CS.[1]  The CS did not know any individuals associated with the

---

[1] The CS was established as a DEA confidential source in 2019.  The CS is currently in good standing with the DEA and has proven to be reliable and has been corroborated to the extent possible, including as discussed in this affidavit.  The CS is a paid confidential source and is not facing any criminal charges. Year to date, the CS has been paid approximately $4,750.  The CS's criminal history includes prior convictions for felony armed robbery in 1990, conspiracy to sell cocaine in 1992, and felony robbery in 1996.

SUBJECT VEHICLE, but had information based on his/her familiarity with the area in which the SUBJECT VEHICLE is located that drugs could be purchased from individuals associated with the SUBJECT VEHICLE.  Due to the suspected drug activity at the SUBJECT VEHICLE, DEA and LAPD investigators decided to use the CS to conduct controlled purchases of drugs at the SUBJECT VEHICLE.

   **A.    SUBJECT VEHICLE Used in Drug Sale to the CS on January 25, 2023.**

   10.  On January 25, 2023, DEA agents met with the CS in a safe and neutral location in Los Angeles, California in preparation for the controlled purchase.  DEA agents equipped the CS with a concealed video/audio recording device and provided the CS with DEA Official Advanced Funds in U.S. dollars (cash) for the purchase.

   11.  On January 25, 2023, at approximately 5:10 p.m., DEA agents and LAPD officers established surveillance in the vicinity of the SUBJECT VEHICLE, which was parked at 6236 S. St. Andrews Place, Los Angeles, CA.

   12.  Based on the CS's statements to investigators, my review of the video and audio recordings of the controlled purchase, and law enforcement observations, I know the following regarding the events of January 25, 2023:

       a.   At approximately 5:12 p.m., the CS arrived at the SUBJECT VEHICLE and began speaking with an unidentified male ("UM1") who was standing outside of the SUBJECT VEHICLE.  The CS asked UM 1 if UM 1 had "something," which the CS reported to

investigators referred to drugs.  An unidentified female ("UF1")
overheard the CS from inside the SUBJECT VEHICLE and yelled out
the door of the SUBJECT VEHICLE to "wait a minute".

  b.    Moments later, UF1 opened the SUBJECT VEHICLE
door and let the CS inside.  Once inside, UF1 asked the CS what
s/he wanted.  The CS advised UF1 that the CS wanted $100 of the
"hard," referring to crack cocaine.  UF1 translated the CS's
request from English to Spanish to another female inside the
SUBJECT VEHICLE -- previously identified by LAPD from prior
encounters as MANZANAREZ – who was weighing suspected crack
cocaine on the bed.  Then CS then provided UF1 with $100
dollars; in return MANZANAREZ provided the CS with a clear
plastic baggie containing a white rock-like substance.  The CS
then exited the SUBJECT VEHICLE and walked back to the DEA
agents.

  c.    The CS gave the plastic baggie to the DEA agents,
who later sent the white rock-like substance to the DEA
laboratory for testing.  The DEA laboratory found that the white
rock-like substance tested positive for crack cocaine.

**B.    SUBJECT VEHICLE Used in Drug Sale to the CS on January
27, 2023.**

  13.  On January 27, 2023, DEA agents met with the CS in a
safe and neutral location in Los Angeles, California in
preparation for the controlled purchase.  DEA agents equipped
the CS with a concealed video/audio recording device and
provided the CS with DEA Official Advanced Funds in U.S. dollars
(cash) for the purchase.

14.  On January 27, 2023, at approximately 3:08 p.m., DEA agents and LAPD officers established surveillance in the vicinity of the SUBJECT VEHICLE parked near 6236 S. St. Andrews Place, Los Angeles, CA.

15.  Based on the CS's statements to investigators, my review of audio recording of the controlled purchase,[2] and law enforcement observations, I know the following regarding the events of January 27, 2023:

a.  At approximately 3:28 p.m., the CS arrived at the SUBJECT VEHICLE and then entered the SUBJECT VEHICLE.  Inside the SUBJECT VEHICLE, the CS saw MANZANAREZ and told her the CS wanted another "100" of the "hard" -- referring to crack cocaine -- and inquired about purchasing "meth" -- referring to methamphetamine.  MANZANAREZ responded "yes" when asked if she had "meth."  The CS then told MANZANAREZ that the CS would buy $100 worth of each type of drug and provided MANZANAREZ with $200. MANZANAREZ then gave the CS two separate clear plastic baggies, one containing a white rock-like substance and one containing a clear crystalline substance. The CS subsequently exited the SUBJECT VEHICLE and walked back to the DEA agents.

b.  The CS gave the two plastic baggies to the DEA agents, who later sent the white rock-like substance and clear crystalline substance to the DEA laboratory.  The DEA laboratory

_____

[2] The video recording device malfunctioned during the controlled purchase and did not record any video.  The audio recording device did capture the controlled purchase successfully.

found that the substances tested positive for crack cocaine and methamphetamine, respectively.

**C.   SUBJECT VEHICLE Used in Drug Sale to the CS on February 03, 2023.**

16.   On February 3, 2023, DEA agents met with the CS in a safe and neutral location in Los Angeles, California in preparation for the controlled purchase.  DEA agents equipped the CS with a concealed video/audio recording device and provided the CS with DEA Official Advanced Funds in U.S. dollars (cash) for the purchase.

17.   On February 3, 2023, at approximately 2:20 p.m., DEA agents and LAPD officers established surveillance in the vicinity of the SUBJECT VEHICLE. The SUBJECT VEHICLE was parked 0.2 miles north (near 1850 W. 60th St., Los Angeles, CA) of its location during the January 25 and 27, 2023 controlled buys, indicating the SUBJECT VEHICLE is operable as a motor vehicle.

18.   Based on the CS's statements to investigators, my review of audio recording of the controlled purchase,[3] and law enforcement observations, I know the following regarding the events of February 3, 2023:

a.   At approximately 2:36 p.m., the CS arrived at and entered the SUBJECT VEHICLE.  Inside of the SUBJECT VEHICLE, the CS encountered MANZANAREZ.  Based on my review of the audio recording, the CS said, "same thing, 1 and 1 and that's 200" then "1 meth 1 you know" while speaking to MANZANAREZ.  Based on

---

[3] The video recording device malfunctioned during the controlled purchase and did not record any video.  The audio recording device did capture the controlled purchase successfully.

my training and experience and familiarity with this
investigation I understood the CS to be referring to $100 of
methamphetamine and $100 of crack cocaine -- the same drugs the
CS purchased from MANZANAREZ on January 27, 2023 -- when the CS
said: "same thing 1 and 1 and that's 200."  Further, based on my
training and experience and familiarity with this investigation,
I understood the CS to be referring to $100 of methamphetamine
when s/he said "1 meth" and the CS to be referring to rock or
crack cocaine when s/he said "you know."  A short time later,
MANZANAREZ handed the CS a tied clear plastic bag of crystalline
substance and a white napkin containing five clear tied plastic
baggies of white rock-like substance.  In exchange, the CS gave
MANZANAREZ $200. After the transaction, the CS exited the
SUBJECT VEHICLE and departed the area.

     b.   The CS returned to the DEA agents and gave them
the plastic baggies.  The DEA agents field tested the
crystalline substance, which tested presumptively positive for
methamphetamine, and the white rock-like substance, which tested
positive for crack cocaine.  The DEA agents later sent the white
rock-like substance and clear crystalline substance to the DEA
laboratory.  The DEA laboratory found that the substances tested
positive for crack cocaine and methamphetamine, respectively, at
the DEA Lab.

    **D.**   **SUBJECT VEHICLE Used in Drug Sale to CS on February
16, 2023.**

    19.   On February 16, 2023, DEA agents met with the CS in a
safe and neutral location in Los Angeles, California in

preparation for the controlled purchase.  DEA agents equipped the CS with a concealed video/audio recording device and provided the CS with DEA Official Advanced Funds in U.S. dollars (cash) for the purchase.

20.  On February 16, 2023, at approximately 1:15 p.m., DEA agents and LAPD officers established surveillance in the vicinity of the SUBJECT VEHICLE, which was parked near 6236 S. St. Andrews Place.

21.  Based on the CS's statements to investigators, my review of the video and audio recordings of the controlled purchase, and law enforcement observations, I know the following regarding the events of February 16, 2023:

a.  At approximately 1:25 p.m., the CS arrived at the SUBJECT VEHICLE and knocked on the door.  There was no answer, and the CS returned to the DEA agents.  At approximately 2:10 p.m., the CS returned to the area near the SUBJECT VEHICLE and was told by bystanders that MANZANAREZ was sleeping down the street.  The CS again returned to the DEA agents.

b.  At approximately 2:14 p.m., the CS arrived outside of the SUBJECT VEHICLE.  The CS approached an unidentified Hispanic male ("UM2") who was standing on the sidewalk utilizing a leaf blower.  The CS engaged in conversation with UM2 and a short time later UM2 walked to the door of the SUBJECT VEHICLE.  At the door, the CS conveyed to UM2 that the CS wanted "100."  Based on my training and experience, I understand the CS was referring to buying $100 dollars of drugs when the CS said s/he wanted "100."  UM2 then

10

entered the SUBJECT VEHICLE, followed by the CS.  UM2 sat down at one end of the SUBJECT VEHICLE and the CS stated s/he wanted "200."  MANZANAREZ was on the bed next to where UM2 was sitting. The CS and UM2 discussed the drug transaction, but UM2 seemed unsure of the quantity of drugs the CS wanted.  UM2 and MANZANAREZ then spoke to one another in Spanish.  The CS then told UM2 "crystal" and MANZANAREZ confirmed with the CS: "crystal."  A short time later, UM2 gave the CS two clear plastic baggies containing a crystalline substance and the CS gave UM2 $200 in return.  The CS then exited the SUBJECT VEHICLE a short time later and walked back to the DEA agents.

        c.   The CS gave the two plastic baggies to the DEA agents.  The DEA agents field tested the crystalline substance which tested presumptively positive for methamphetamine.  The DEA agents later sent the clear crystalline substance to the DEA laboratory.  The DEA laboratory found that the substance tested positive for methamphetamine.

    **E.    SUBJECT VEHICLE Connected to a Drug Sale to CS on March 16, 2023.**

22.  On March 16, 2023, DEA agents met with the CS in a safe and neutral location in Los Angeles, California in preparation for the controlled purchase.  DEA agents equipped the CS with a concealed video/audio recording device and provided the CS with DEA Official Advanced Funds in U.S. dollars (cash) for the purchase.

23.  On March 16, 2023, at approximately 12:57 p.m., DEA agents and LAPD officers established surveillance in the

vicinity of the SUBJECT VEHICLE, which was parked near 6231 S. St. Andrews Place.

24.  Based on the CS's statements to investigators, my review of the audio and video recordings of the controlled purchase, and law enforcement observations, I know the following regarding the events of March 16, 2023:

a.  At approximately 1:17 p.m., the CS entered the SUBJECT VEHICLE and spoke to an unidentified Hispanic male ("UM3") and MANZANAREZ.  The CS stated s/he wanted to "spend a lot today for the party" and had $500.  MANZANAREZ then said "$500?" and asked what CS wanted.  The CS then asked for "meth" and MANZANAREZ advised she did not have "meth" and only had "a lot of crack."  UM3 then told the CS that the meth would arrive in 25 minutes to a half hour at most.  The CS stated s/he would be back and left the SUBJECT VEHICLE.  The CS then returned to the DEA agents

b.  At approximately 2:12 p.m., The CS walked back to the SUBJECT VEHICLE.  UM3 was outside the SUBJECT VEHICLE and followed the CS inside of the doorway to the SUBJECT VEHICLE. The CS then said that MANZANAREZ was sleeping inside, and CS and UM3 exited the SUBJECT VEHICLE.  UM3 then led the CS to a tarp-covered white van parked directly south of the SUBJECT VEHICLE. Another unidentified elderly Hispanic male (UM4) was sitting inside the white van.  The CS told UM3 that s/he wanted to spend $50 for "crack."  UM3 and UM4 had a brief conversation in Spanish and UM4 walked away from the white van.  UM4 then tied up three clear plastic baggies of rock-like substance and

provided it to the CS; in exchange the CS gave UM4 $50.  The CS
then walked away and returned to the DEA agents.

      c.  Upon returning to the DEA agents, the CS gave
them the three baggies.  The DEA agents field tested the rock-
like substance which tested presumptively positive for cocaine
base.  The DEA agents later sent the white rock-like substance
to the DEA laboratory.  The DEA laboratory found that the
substance tested positive for cocaine at the DEA Lab.

    **F.   SUBJECT VEHICLE Used in Drug Sale to CS on March 23, 2023.**

25.  On March 23, 2023, DEA agents met with the CS in a
safe and neutral location in Los Angeles, California in
preparation for the controlled purchase.  DEA agents equipped
the CS with a concealed video/audio recording device and
provided the CS with DEA Official Advanced Funds in U.S. dollars
(cash) for the purchase.

26.  On March 23, 2023, at approximately 12:55 p.m., DEA
agents and LAPD officers established surveillance in the
vicinity of the SUBJECT VEHICLE, which was parked near 6231 S.
St. Andrews Place.

27.  Based on the CS's statements to investigators, my
review of the audio and video recordings of the controlled
purchase, and law enforcement observations, I know the following
regarding the events of March 23, 2023:

      a.  At approximately 1:13 p.m., the CS arrived at the
SUBJECT VEHICLE and called out "Mama" at the rear window to the
SUBJECT VEHICLE.  MANZANAREZ's face then appeared through the

side window of the SUBJECT VEHICLE.  The CS told MANZANAREZ:
"Hey honey, I got $300."

      b.   MANZANREZ let the CS inside the SUBJECT VEHICLE.
The CS then handed MANANAREZ $300 and MANZANAREZ asked the CS
what s/he wanted.  The CS said: "Meth."  MANZANAREZ tied a clear
knotted plastic baggie of clear crystalline substance together
and handed it to the CS.  The CS then exited the SUBJECT VEHICLE
and walked back toward the DEA agents.

      c.   The CS gave the clear knotted baggie of
crystalline substance to the DEA agents.  The DEA agents field
tested the crystalline substance which tested positive for
methamphetamine.  The DEA agents later sent the clear
crystalline substance to the DEA laboratory for further testing.
DEA is awaiting results from the laboratory.

    **G.**   **SUBJECT VEHICLE Used in Drug Sale to CS on April 6,**
          **2023.**

    28.  On April 6, 2023, DEA agents met with the CS in a safe
and neutral location in Los Angeles, California in preparation
for the controlled purchase.  DEA agents equipped the CS with a
concealed video/audio recording device and provided the CS with
DEA Official Advanced Funds in U.S. dollars (cash) for the
purchase.

    29.  On April 6, 2023, at approximately 3:00 p.m., DEA
agents and LAPD officers established surveillance in the
vicinity of the SUBJECT VEHICLE, which was parked near 6231 S.
St. Andrews Place.

30.   Based on the CS's statements to investigators, my review of the audio and video recordings of the controlled purchase, and law enforcement observations, I know the following regarding the events of April 6, 2023.

a.   At approximately 3:19 p.m., the CS asked an unidentified Hispanic male ("UM5") outside of the SUBJECT VEHICLE if "Mama" was inside the SUBJECT VEHICLE (referring to MANZANAREZ).  The CS then entered the SUBJECT VEHICLE and observed another unidentified male ("UM6") smoking crack cocaine inside the doorway, as well as MANZANAREZ.  The CS then handed MANZANAREZ $400, and she said s/he needed "crystal," referring to crystal methamphetamine.  MANZANAREZ then weighed out a clear crystalline substance on a scale next to her bedside. MANZANAREZ handed the CS a clear tied plastic baggie containing the crystalline substance.  The CS exited the SUBJECT VEHICLE and returned to the DEA agents.

b.   The CS gave the plastic baggie to the DEA agents. The DEA agents field tested the crystalline substance which was positive for methamphetamine. The DEA agents sent the methamphetamine to the DEA laboratory for further testing and weight.  DEA is awaiting results from the laboratory.

### V.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

31.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-

level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where drug traffickers have ready access to them, such as on their cell phones and other digital devices, and in their residences.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on

16

their digital devices and in their residence.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, including in the form of calendar entries and location data.

e.    Drug traffickers often use vehicles to transport their narcotics and may keep stashes of narcotics in their vehicles in the event of an unexpected opportunity to sell narcotics arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences and vehicles.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence or in safes.  They also often keep other items related to their drug trafficking activities at their residence, such as digital scales, packaging materials, and proceeds of drug trafficking. These items are often small enough to be easily hidden and thus may be kept at a drug trafficker's residence even if the drug trafficker lives with others who may be unaware of his criminal activity.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry

17

Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.

32.  Further, based on my training and experience, and familiarity with this investigation, I believe that MANZANAREZ and her unidentified co-conspirators are receiving additional supplies of drugs on a continuous basis.  Based on my training and experience, I know that it is common for drug traffickers to use phones to coordinate the delivery of their supply.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

33.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    34.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data

during a search of the premises for a number of reasons,
including the following:

      a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

      b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

    35.  The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

      a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

     b.  In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

     c.  Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress MANZANAREZ's thumb and/or fingers on
the device(s); and (2) hold the device(s) in front of
MANZANAREZ's face with his or her eyes open to activate the
facial-, iris-, and/or retina-recognition feature.

36.  Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VII. <u>CONCLUSION</u>

37.  For all the reasons described above, there is probable
cause to believe that the items listed in Attachment B, which
constitute evidence, fruits, and instrumentalities of violations

of 821 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) will be found in the SUBJECT VEHICLE, as described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 14th day of
April, 2023.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE